### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

KENNA ROTHERMEL,                                )
                                                )
                    Plaintiff,                  )
                                                )
vs.                                             )        Case No. 6:22-cv-01194-JWB-RES
                                                )
BOARD OF COUNTY COMMISSIONERS OF                )
SEDGWICK COUNTY, KANSAS; SHERIFF                )
JEFF EASTER, in his official capacity; and      )
DETENTION DEPUTY TONY LOSAVIO,                  )
in his individual and official capacity,        )
                                                )
                    Defendants.                 )
_____)

### RESPONSE IN OPPOSITION TO DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

COMES NOW the plaintiff and for her response to the defendants' motion for summary

judgment, states as follows:

### RESPONSE TO STATEMENT OF UNCONTROVERTED FACTS

1.      Admitted

2.      Admitted

3.      Admitted

4.      Admitted

5.      Admitted with clarification to avoid confusion. LoSavio was indeed assigned as a
        detention deputy in the month of May 2021 but had been employed in that
        position long before May 2021. (See plaintiff's subsequent statements of facts)

6.      Admitted

1

7.      Admitted

8.      Admitted with clarification. LoSavio was convicted of some of the crimes he committed against the plaintiff and for which he was charged.  He entered into a plea bargain with the district attorney's office whereby some of his charges were dismissed.

9.      Admitted

10.     Admitted

11.     Admitted

12.     Admitted with respect to the requirements of PREA compliance but denied as to any claim that the SCSO was in fact compliant.

13.     Admitted

14.     Admitted

15.     Admitted

16.     Admitted

17.     Admitted

18.     Admitted

19.     Admitted

20.     Admitted

21.     Plaintiff admits she called a friend but any negative suggestion or implication being made by defendants is denied.

22.     Admitted

23.     Admitted

24.     Admitted

25.     Admitted

26.    Admitted

27.    Admitted

28.    Admitted

29.    Admitted

30.    Admitted

31.    Admitted

32.    Admitted

33.    Admitted

34.    Admitted

35.    Admitted

36.    Admitted

37.    Admitted

38.    Admitted

39.    Admitted

40.    Admitted

41.    Admitted

42.    Admitted

43.    Admitted

44.    Admitted

45.    Admitted

46.    Admitted

47.     Admitted.

48.     Admitted

49.     Admitted

50.     Admitted

51.     Admitted

52.     Admitted

53.     Admitted

54.     Admitted

55.     Admitted

56.     Admitted that video was reviewed. Deny this was consistent with LoSavio checking on her welfare as it would be more consistent with continued sexual harassment. (Robertson Depo. 13:24-16:10)

57.     Admitted

58.     Admitted

59.     Admitted that was what they decided.

60.     Admitted

61.     Denied.  There is no showing or testimony that anybody was "directed" to have a discussion. Sheriff Easter states only that there was a discussion about potentially having a discussion. (Easter depo 32:4-33:21) No record of any such action has ever been provided to the plaintiff and would or should have been produced if that had actually happened.

62.     Admitted that Sheriff Easter testified he chose not to move LoSavio to protect against future sexual assaults.

63.     Admitted

64.     Admitted

65.     Admitted

66.     Admitted although this is a statement of law – not a "statement of material fact."

67.     Admitted although this is a statement of law – not a "statement of material fact."

68.     Admitted although this is a statement of law – not a "statement of material fact."

69.     Admitted although this is a statement of law – not a "statement of material fact."

70.     Admitted although this is a statement of law – not a "statement of material fact."

71.     Admitted

72.     Admitted

73.     Admitted

74.     Admitted

75.     Admitted

## INTRODUCTURY COMMENTS REGARDING PLAINTIFF'S STATEMENTS OF ADDITIONAL UNCONTROVERTED FACTS

The defendants have in some instances simply attempted to summarize facts without including details of significance. Accordingly, plaintiff herein will attempt to point out those details which may require repetition of facts set forth by the defendants in order to maintain context.

## PLAINTIFF'S STATEMENTS OF ADDITIONAL UNCONTROVERTED FACTS

### May 2019 - Bowers complaint against LoSavio

76.     As early as May 2019, Jacqueline Bowers complained about Tony LoSavio through a PREA request.  (PREA report)

77.     Sergeant Brent Rogers (male), was evidently assigned to the investigation after

Deputy Neil (female) reported to him that Ms. Bowers had told her "Deputy LaSavio went to her cell door earlier in the shift and stated that he wanted to stick his penis in her buttocks." (Sheriff records; Taylor depo. 9:13-18)

78.     When Sgt. Rogers went to interview her for follow-up, Ms. Bowers asked for her lawyer to be present when she discussed this. (Sheriff records; Taylor depo. 11: 15-25)

79.     Sgt. Rogers responded by simply writing that "the conversation was ended when she walked away from the cell door." The discussion was reported to Lt. Taylor. (Sheriff records – Incident Narrative report)

80.     At some point following this, Detective Shawn McMahon became involved. In his report, Det. McMahon noted that he interviewed LoSavio on June 18, 2019 and LoSavio denied the statements. The report actually has 2 different dates of April 23 and May 20-21 but Det. McMahon doesn't know why. (McMahon report; McMahon depo. 17:15-18:21)

81.     Detective McMahon also interviewed Jacqueline Bowers. (McMahon Depo:12 – 18)

82.     The following day, June 20, 2019, by which time Ms. Bowers was no longer incarcerated, Det. McMahon called and left her a voice mail. Ms. Bowers called back and left a voicemail that she had obtained her own lawyer and her personal pursuit of the matter, if any, would be through that lawyer. McMahon never got her version. (McMahon depo. 16:22-24)

83. Det. McMahon's investigative report was not finalized or signed until March 12, 2021, nearly two years after the reported incident. The detective has no explanation for this. (Sheriff records; McMahon depo. 15:8-11)

84.     Det. McMahon did the investigation but did not fill out the Sexual Assault Report. (McMahon Depo 10:19 – 24)

85.     According to the report dated March 12, 2021, the case was submitted to the District Attorney's Office and McMahon advised that formal prosecution was denied due to "lack of cooperation" by the victim. (McMahon report)

86.     An unsigned "Sexual Assault Report" form relative to Ms. Bower's complaint, and specifically unsigned as to Part C, contained a conclusion to the investigation of Ms. Bowers determining the report was "UNFOUNDED." (Sexual Assault Report)

87.     The instructions in the form itself specifically instruct that use of "UNFOUNDED" means "the event was determined NOT to have occurred." (Sexual Assault Report)

88.     That same form shows LoSavio's Hire Date as 3/27/17 but also states he had been on the job for "4 years," which would put the potential completion date of the report in March 2021, the same month as the above referenced investigative report. (Sexual Assault Report)

89.     The documents, forms and files provided show no attempts to conduct further investigation, no indication whatsoever that LoSavio was warned about his conduct, no suggestion that his actions would be monitored or restricted to safeguard the female inmate population.  (Sexual Assault Report and Sheriff's records)

90.     Det. McMahon had spoken with Ms. Bowers over the phone about her complaint that LoSavio told her he wanted to put his penis in her buttocks.  (McMahon Depo 15:23 – 16:2)

91.     LoSavio denied saying that (McMahon Depo 20:21 – 25)

92.     Det. McMahon did take the complaint to the DAs office which concluded that due to a lack of cooperation by the victim, the case was going to be closed (McMahon Depo 21: 1-4)

93.     Det. McMahon never advised anyone to conclude that the event was "unfounded." He did not tell anyone to fill in that box on the form and he did not fill it out. (McMahon Depo 28:12 – 19)

94.     When asked if he ever determined that the incident was unfounded or had not occurred, Det. McMahon said "No." (McMahon Depo 30:22-23)

95.     When asked about Ms. Bower's complaint that "Deputy LaSavio went to her cell door earlier in the shift and stated that he wanted to stick his penis in her buttocks," the Sheriff said that was not sufficient - because he (the sheriff) requires "some type of evidence other than just this person saying this statement was made to me." (Sheriff Easter Depo 24:9 – 24)

96.     The sheriff's investigative position is that if an inmate (like Ms. Bowers) who is the victim of a sexual assault requests her lawyer be present when being interviewed by his staff, the investigator has no obligation to allow that (Sheriff Easter Depo 19:13 - 18), that he does not believe a victim inmate has any right to a lawyer (Sheriff Easter Depo 17:5-9), and he will still consider that to be a complete and full investigation into the allegation. (Sheriff Easter Depo 19:13 – 18)

97.     When asked if that was good investigating technique, the Sheriff responded by saying the law "says we do not have to provide a lawyer." (Sheriff Easter Depo 23:20 –25)

98.     When the question was clarified that "I'm not asking what you have to provide," the Sheriff responded: "That's the answer you are getting, sir. The law doesn't require us to

provide a lawyer." (Sheriff Easter Depo 23:20 –25)

99.     Sheriff Easter insisted "you have to be able to show that there was a witness, there was some type of evidence other than just this person saying this statement was made to me." (Sheriff Easter Depo 24: 21-24)

100.    The sheriff acknowledges that he believes the complaint by Ms. Bowers and the following investigation was determined to be "unfounded" which he acknowledged meant it was determined "not to have occurred." (Sheriff Easter Depo 24:25 – 25:10)

101.    Lt. Keekee Taylor is a detention lieutenant in the Professional Standards Unit for the sheriff's department. (Taylor Depo 4:8-10).  He reports directly to the sheriff. (Taylor Depo 48: 17-18)

102.    He became the PREA coordinator/administrative lieutenant in 2019 and received no training other than what he learned from the person who held the position before him. (Taylor Depo 7:19-24; 8:13-24)

103.    With respect to Ms. Bower's complaint form about LoSavio, he does not recall whether he filled out the form (Taylor Depo 25:9-12) because it is not signed. (Sexual Assault Report Complaint form)

104.    Based on reading the statement as to what happened, Lt. Taylor would not have concluded the complaint was "unfounded." (Taylor Depo 28:5-10)

105.    Lt. Taylor admits that her complaint that LoSavio told her he wanted to put his penis in her buttocks may have been true and it would therefore have been inappropriate to complete that report by saying that the complaint was unfounded. (Taylor Depo 30:3-13)

106.   Lt. Taylor, as PREA coordinator, doesn't know how or if there even is a mechanism where multiple complaints against a jailer are reported up the chain of command so somebody recognizes multiple complaints against the jailer. (Taylor Depo 54:4-18)

107.   Lt. Taylor is unaware of any standard, rule, training or policy whereby a second or multiple complaints against the same person are discussed or considered with respect to protecting inmates from that particular person. (Taylor Depo 54:19- 55: 3)

**December 23, 2019 - Lerma complaint against LoSavio**

108.   On or about December 23, 2019, another PREA complaint was made by Julia Lerma against Tony LoSavio. (PREA complaint)

109.   The PREA complaint alleged that LoSavio came to use a plunger on the toilet in their cell and while doing so began to touch Ms. Lerma's breasts with both hands. (PREA complaint form; sheriff records)

110.   After six days, someone was assigned to investigate. Though it is not clear from the records, the person assigned appears to have been Sgt. Chris Tucker (male) and he reported that he checked the camera and nothing was found. (Tucker report; sheriff records)

111.   LoSavio was interviewed on January 7, 2020, and acknowledged having used a plunger on December 23, 2019, but commented that Ms. Lerma kept telling him he looked attractive. He claimed he simply left. (Robertson Investigative report)

112.   Ms. Lerma was interviewed by Sgt. Robertson who testified she reported LoSavio "touched her breast with both hands" and specifically that "he had put his right hand into her bra."

(Robertson Investigative report)

113.    Ms. Lerma also reported that LoSavio "just laughed at her" about this incident but also that LoSavio "rubbed his pants, because he had an erection." (Robertson investigative report; Robertson Depo 11: 8-11)

114.    Sgt. Douglas Robertson performed the investigation regarding the complaint by Julia Lerma that Deputy LoSavio "had touched her breast while in her cell." (Robertson Depo 10:6 – 11)

115.    She stated that he had used both hands, touched her breasts, and that he had rubbed himself because he had an erection or something like that. (Robertson Depo 11:4 – 11)

116.    There was nothing that she told him that he thought was not credible at the time. (Robertson Depo 12:3-5)

117.    He spoke with LoSavio who reported that Ms. Lerma kept saying to him "that he looked attractive" (Robertson Depo 16:11-14).

118.    Robertson thinks that LoSavio told him that he didn't do it but there is nothing in the report that says that. (Robertson Depo 16:20 – 17:3)

119.    In March, 2020, Sedgwick County reported that Ms. Lerma's complaints were "UNSUBSTANTIATED," defined as "Evidence was insufficient to make a final determination that the event occurred." (Staff Sexual Misconduct and Harassment form)

120.    Sheriff Easter agreed that it would be highly inappropriate for LoSavio to begin to touch Ms. Lerma's breasts. (Sheriff Easter Depo 27:24 – 28:6)

121.    Assuming Ms. Lerma's further report that LoSavio "rubbed his pants because he

had an erection" together with her other complaints were true and correct, Sheriff Easter admits "we should have done something about that." (Sheriff Easter Depo 31:5 – 24)

122.    The staff sexual misconduct and harassment form used by the sheriff's department lists sanctions that should be considered. Those include training, counseling, reprimanded, disciplined, diminished responsibility, demotion, or transfer to a different facility or unit, among other possible sanctions including termination.  If no sanctions are considered, the form has a place to mark "No action taken." (Staff sexual misconduct and harassment form)

123.    None of the options in the sections regarding sanctions were completed for either the Bowers or Lerma complaint. (Staff sexual misconduct and harassment form)

124.    There is absolutely no indication in or following those reports that the jail personnel or those in charge did anything to restrict LoSavio's contact with female inmates. (Sheriff records)

**Treatment of the defendant after complaint**

125.    Following her May 4 complaint, Ms. Rothermel attempted to make contact with jail personnel regarding this and other incidents and was often met with skepticism or resentment. On May 4, 2021, Kenna asked to speak to someone, and the skeptical response was "what is this about?"  When she responded further that it concerned a sexual assault issue, they at one point even indicated she had already addressed that and provided no indication of a willingness to speak further. (PREA complaint; sheriff records)

126.    After it became obvious that her complaints were legitimate, often her treatment was less than sympathetic while being required to describe these events. At one point, plaintiff

was left for about eight hours in a solitary room with no windows, contact, food or water.  (Video recording provided by defendants)

128.    Ms. Rothermel advised investigators that every time LoSavio worked in pod 22, he asked her to do something inappropriate. (Video recording provided by defendants)

128.    Sheriff Easter admitted other incidents were alleged and stated that there were "at least eight" such prior incidents. (Wichita Eagle News conference report)

**Responsibilities of defendants**

129.    Jail deputies have a duty to protect the inmates. (Sheriff Easter depo 7: 11-13)

130.    The Sheriff's Department and it's employees have a responsibility to provide a safe and secure environment for the inmates.   (Sheriff Easter depot 6: 14 -21)

131.    Kenna Rothermel had the right to be safe and secure while in the jail, including the right to be safe and secure from sexual assault. (Sheriff Easter deposition 14:18 – 23)

132.    An inmate report of being sexually assaulted by a jailer is an allegation that deserves serious consideration. (Sheriff Easter Depo 22:11 – 14)

133.    Sheriff Easter claims to remember having a conversation with Colonel Schechter in reference to the two prior complaints regarding Deputy LoSavio. (Sheriff Easter Depo 33:14 – 16)

134.    Sheriff Easter informed him that they needed to speak with LoSavio because he was "in positions by himself with females that are making complaints on him, and he needed to understand the positions he's putting himself in." (Sheriff Easter Depo 33:17 – 21). The Sheriff

did not testify that ever happened. (Sheriff Easter Depo 33: 17-21)

135.    Despite that knowledge, the Sheriff admits the Department took no action at that time to protect the women inmates and they did not do anything to protect them from that possibility in the future. (Sheriff Easter Depo 33:22 – 34:3)

136.    Sheriff Easter admitted there was no reason why they could not have moved LoSavio at that time into guarding male inmates.  He further acknowledged that would have been something that would likely have solved the potential for sexual assault or intimidation by LoSavio towards female inmates." (Sheriff Easter Depo 34:4 – 11)

137.    Sheriff Easter testified "in this case here in hindsight, should we have maybe looked at LoSavio for some other training? Yes, I would agree with that." (Sheriff Easter Depo 35:3 – 5)

138.    Sheriff Easter admitted that the two prior allegations were "serious accusations against the jailer," that they were not proven to be unfounded, and that they could have given LoSavio more training. (Sheriff Easter Depo 35:21 – 36:7). He further stated they just "didn't think about it at the time." (Sheriff Easter Depo 36:19 – 20)

139.    Sheriff Easter admitted they did not "take any action of any nature whatsoever from that point forward to protect female inmates from Deputy LoSavio.  (Sheriff Easter Depo 36:21 – 25)

140.    While stating that if they had chosen to terminate LoSavio's employment following the two prior complaints, he thinks he would've "lost in an employment hearing" but admitted as "accurate" that LoSavio could have been transferred to a male portion of the facility

which would have reduced the private contact with females in an inmate's cell or cell area. (Sheriff Easter Depo 37:16 – 38:6)

141.   Sheriff Easter conceeded "That would have been an appropriate thing to do." Sheriff Easter Depo 38:7 – 11)

142.   When asked what other training could or should have been done after the second incident, Sheriff Easter admitted that additional training "in reference to sexual harassment, intercommunicating, interpersonal communication training" could have been done and there was no reason why it could not have been performed at that time.  (Sheriff Easter Depo 40:3 – 13)

143.   Sheriff Easter offered confusing advice and opinion with regard to whether a person in Kenna Rothermel's position as an inmate had any ability to defend themselves against the deputy who was in charge of her safety and was at the same time raping her.  (Sheriff Easter Depo 42:25 – 46:4)

144.   Capt. Darren Ramsey became the PREA coordinator in January 2021.  At the time he took over those responsibilities, he was never advised that LoSavio had prior complaints against him. (Ramsey Depo 25:17-22).  That is something he would like to have known.  (Ramsey Depo 25:23 – 25).

145.   He believes it would be appropriate for a person who makes a sexual assault allegation to have a lawyer present with them when interviewed. (Ramsey Depo 26:17 – 21)

146.   PREA complaints should be taken seriously. (Ramsey Depo 30:24 – 31:2). If a guard has multiple PREA complaints and if there is knowledge of those prior complaints, each one should be taken more seriously. (Ramsey Depo 31:3 – 10)  But in Sedgwick County, there is

no mechanism by which the PREA coordinator knows there have been prior complaints unless it's the same coordinator who happens to remember a previous one. (Ramsey Depo 31:11 – 16).

150.    Following the events involving LoSavio, plaintiff experienced retribution by other guards for reporting this event. Beginning the day after, while obviously still in jail, plaintiff on at least six subsequent occasions sought to speak with employees within the jail.  On May 5, 2021, she asked to speak to someone as soon as possible and their only response was "What is this about?" The following day, she asked to speak to a sergeant concerning an issue with the sexual assault and the response reflected indifference because she had already had a conversation that day. On May 24, the PREA complaint shows her concern about retribution when a deputy had specifically told her "you can't get your way with all the guards opening your mouth and legs for the guard…" On June 5, she reported feeling awkward and embarrassed because she had not been able to talk to a sergeant since approximately six days before. A PREA on June 27 contained reports of additional mistreatment by guards following her report against LoSavio. And even as late as November 2021, her PREA reflects that yet another deputy treated her poorly and complained that she got his fellow deputy (LoSavio) "fired" and she was accused of being a "slut." (PREA inquiry and complaints attached hereto)

## ARGUMENTS AND AUTHORITIES

### Standard of Review

The standards of review on a Motion for Summary Judgment are well known.  A most succinct statement of the standard simply states the facts are to be construed "in the light most favorable to" the non-moving party. *Schneider v. City of Grand Junction Police Dept.*, 717 F. 3d

760 (10th Cir. 2013); *Ribeau v. Katt*, 681 F.3d 1190, 1194 (10th Cir.2012).

*Tabor v. Hilti, Inc.,* 703 F.3d 1206 (2013) includes the court's duty to "draw all reasonable inferences" in favor of the non-moving party and grant summary judgment "only if…. 'there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law.'" *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir.2012).  A dispute over a material fact is `genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir.2000) (citation omitted).

The Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* 477 U.S. at 248, 106 S.Ct. 2505.

### INTRODUCTION TO THE ARGUMENT

In what seems to be a rather curious beginning, the defendants introduce their position disputing the first two issues (denominated as B. and C.), neither of which were raised in their pleadings nor appear in the pretrial order.  Accordingly, plaintiffs object to these late arguments and a review of the very case cited by defendants therein clearly indicates the court may not consider such a defense where objection is made. *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 261 P.3d 943, 959 (2011), cited by the defendant, notes:

> When the proponent argues or offers evidence on an affirmative defense without objection from the opposing party that the defense had not been pled, the court may consider the defense. The rule permitting use of an unpled affirmative defense in the absence of an objection based on its omission from the answer is one of long standing. See Owner-Operator Indep. Drivers, Inc. v. USIS Commercial Services, Inc., 537 F.3d 1184, 1190 (10th Cir.2008); Hardin v. Manitowoc-Forsythe Corp., 691 F.2d 449, 458 (10th Cir.1982); Wagner v. United States, 573 F.2d 447, 452 (7th Cir.1978).

Accordingly, as noted, plaintiff objects to defendants' reliance on these issues though will briefly address them substantively.

## B. The BOCC is a proper party.

On a factually substantive basis, this claimed defense/objection is without merit. While it is generally true that the sheriff is responsible for matters occurring within the jail over which he has primary responsibility, that does not, of necessity, mean that the BOCC is without independent responsibility. For example, as set forth in the case of *Thomas v. County Commissioners of Shawnee County,* 40 Kan. App. 2d 946, 198 P.3d 182 (2008), Kansas recognizes claims of negligent supervision of employees (including jail employees) and negligent retention of employees for which the County owes an independent duty and is, or can be, responsible. The county has an independent duty of reasonable care to the plaintiff. See *Thomas,* 40 Kan. App. 2d at 195.

While the BOCC may not require particular operational practices, by being responsible for establishing the budgeting for jail operations, it indirectly controls and should therefore be at least comparatively responsible for the consequences of its decisions.

## C. Sheriff Easter is not immune under the Eleventh Amendment

Defendant argues that he is immune from suit in this matter because Kansas amended its

constitution in response to Couser v. Gay, 959 F.3d 1018 (10th Cir. 2020), which "held the office of sheriff was not entitled to Eleventh Amendment immunity based largely on the fact the Kansas Constitution did not mention the sheriff's office." Defendants Motion, at 15 (emphasis added). Apart from the illogic and unfairness of a claimed retroactive application of newly-created immunity, defendant ignores much of the Couser case, which held that sheriffs do not enjoy immunity under Kansas law in part based on the constitution, but also based on a "balance" of four factors—how state law characterizes the sheriff, the sheriff's law enforcement autonomy, finances, and local concerns—which "all...point in the same direction...strongly on the side of finding that Kansas sheriffs" are not entitled to immunity. Couser, 959 F.3d at 1030-31 (emphasis added).

Further, defendant's argument is not even accurate as to the amendment that was passed. That amendment had nothing to do with abrogating Couser. Rather, it provided for election of sheriffs by county members, rather than appointment. Importantly, although it did amend section 2 of article 9, it still lists sheriffs under "county and township officers." See State of Kansas Official General Election Ballot Constitutional Amendment, November 8, 2022, accessed at https://sos.ks.gov/elections/22elec/2022-General-Election-Constitutional-Amendment-HCR-5022.pdf (last accessed October 10, 2023).

The defendant's argument for immunity should fail.

**D. There is a clear basis for Monell liability against the BOCC and Sheriff Easter.**

*Monell v. Department of Social Services of New York*, 430 U.S. 658, 690 (1978), limited governmental liability as an entity under section 1983 to circumstances where "the action that is

alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." It further clarified that when execution of a government's policy or custom might "fairly be said to represent official policy," there is liability. *Id.* at 694.

To state a claim, a party need only allege sufficient facts to demonstrate that *it is plausible* that the employee committed a constitutional violation and that the policy or custom was the moving force behind the deprivation. *See Jiron v. City of Lakewood*, 392 F. 3d 410 (10th. Cir. 2004) at 419. (Emphasis supplied). The plaintiff must further show that "the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schnieder v. City of Grand Junction Police Department*, 717 F. 3d 760 (10th Cir 2013). The deliberate indifference standard is satisfied by proof that a municipal actor disregarded a known or obvious consequence of his action. *Board of the County Commissioners v. Brown*, 520 U.S. 397, 410 (1997).

Of course, the Sheriff's Department must have actual or constructive notice of the particular issue. That is virtually undeniable in this case. At that point, a policy or custom can be formal or informal if amounting to a widespread practice, but generally would involve the failure to adequately train or supervise employees or having a deliberate indifference to the injuries that may be caused by the Sheriff's officer. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).

The case of *Gonzales v. Martinez*, 403 F. 3d 1179,1187 (10th Cir. 2005) is on particular point given that Sheriff Easter was made aware of the reported risks involving the conduct of

LoSavio. The Court noted in Gonzales that the Sheriff's "knowledge of reported risks to inmate health or safety…surely raise a reasonable inference that Sheriff Salazar knew of and disregarded an excessive risk to Ms. Gonzales." The Court concluded that:

> "Under these circumstances, at the least, Ms. Gonzales has raised a triable issue of material fact that Sheriff Salazar had the 'requisite knowledge of a substantial risk,' which… may be demonstrated 'in the usual ways, including *inference* from circumstantial evidence.'" 511 U.S. at 842, 114 S.Ct. 1970 (Emphasis original).

The Court concluded the matter was triable and therefore had been "prematurely dismissed at the summary judgment stage."

The case of *Tafoya v. Salazar*, 516 F. 3d 912 (10th Cir. 2008) has similarities. Recognizing the jail's duty to protect female inmates from sexual assaults, among other things, the court discussed that deliberate indifference meant the official must be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists. The risk involved need not be particular to any certain inmate. Further, a jury is permitted to infer that a prison official had actual knowledge based upon circumstantial evidence, etc. Where such evidence exists, failure to take reasonable steps to alleviate the risk meets the standard of deliberate indifference. In simpler terms, the court would suggest that when other reasonable alternatives exist to prohibit a dangerous condition, the sheriff's failure to enforce new policies or to take efforts reasonably calculated to reduce the risk may make the prison official liable for harm suffered by inmates. Where such conditions exist, there is sufficient evidence for a jury to make those determinations.

The proof required is satisfied if the evidence shows any of a number of possible involvements (applicable here) including where the Sheriff created or allowed the continuance of

a policy or custom under which unconstitutional practices occurred, was grossly negligent in supervising subordinates who committed the wrongful acts, **OR** exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *See Morris v. Eversley*, 282 F. Supp. 2d 196 (S.D.N.Y. 2003) citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995); see also *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams*, 781 F.2d at 323-24).

Additional proof of policy, customs, indifference, and negligence within the jail may be shown by the PREA concerns expressed from Kenna following this incident. (See plaintiff's SOF #150 and PREA documents).

In *Estate of Holmes by and through Couser*, 387 F. Supp. 3d 1233, 1262-1263 (2019) the Court, ruling on a Motion to Dismiss, noted principles which plaintiff suggests provide justification for the plaintiff's position before the Court. Those include that a pattern of similar constitutional violations is sufficient to establish deliberate indifference. *Connick*, 563 U.S. 51, 62 (2011); the harm alleged by Plaintiff is a harm that one would plausibly expect the alleged training failures to cause; there is a policy of failing to supervise and discipline which can be established by showing (1) a custom or policy of failure to discipline; (2) deliberate indifference on the part of the decision maker, and (3) a causal link to the constitutional deprivation and finally that evidence of prior complaints can be sufficient to show that a municipal Defendant and the officials ignored the officers' misconduct. *See Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009).

The facts in this case clearly justify the plaintiff's position and a summary of the

Plaintiff's Statement of Additional Uncontested facts show this clearly:

Two years before the date involved in this case, there was a specific report and complaint that Deputy LoSavio told a female inmate "he wanted to stick his penis in her buttocks." This report was made to a female deputy but a male deputy was assigned to interview the inmate. She advised him that she wanted her lawyer to be present. Rather than even trying to make arrangements for that to occur, the male deputy simply reported up the chain of command to a lieutenant. At some later point, a detective interviewed LoSavio and, not surprisingly, he denied making the statement. The detective's report has multiple dates that don't match up and ultimately wasn't signed for almost 2 years. Ultimately, a sexual assault report was made by yet a different person but was never signed and concluded Ms. Bowers' claim was UNFOUNDED or, in other words, "did not occur." The detective denied ever making such a determination. Lt. Taylor admitted that would not have been a correct determination. But the sheriff nevertheless considered this to be a complete and full investigation, figuratively turning his back on the potential truth and not considering it sufficient to justify a complaint, insisting that he requires something "other than just this person saying this statement was made."

Approximately seven months later, in December 2019, yet another female inmate, Ms. Lerma made a PREA complaint against LoSavio. She reported that he began to touch her breasts with both hands. She gave a description of the event consistent with what could easily have been true. It was six days before someone was assigned to investigate and again the investigation was by a male. Ms. Lerma described how afterwards, LoSavio was rubbing himself because he had an erection. Sgt. Robertson thought she was credible. When he was asked about it, LoSavio

strangely claimed that Ms. Lerma kept telling him that he looked attractive – that he kept saying that to the investigator, Sgt. Robertson. The Sargent thought that LoSavio claimed he didn't do that but there is nothing in his report that contains such a denial.  Again, the sexual assault report says only that the evidence was insufficient.  Sheriff Easter admitted that if her statements were true, he should have done something. In spite of Sgt. Robertson's testimony that she was credible, the Sheriff turned his back on the inmates and there were no restrictions placed on LoSavio – he remained guarding the female population.

The Sheriff admits that these allegations deserve serious consideration and that Kenna Rothermel had the right to be safe and secure from sexual assault. He testified his concern after the second complaint was for LoSavio to "understand the positions he was putting himself into" (as opposed to what the inmates were being put through). But in spite of acknowledging they needed to speak with LoSavio, there is no evidence that any discussions were had, and they did not restrict him from access to the female population.  The Sheriff admits that the Department took no action to protect the women inmates from that possibility in the future.   He acknowledged they could have moved LoSavio into guarding male inmates and that by doing so that would likely have solved the potential for assault for the female inmates. He acknowledged that the previous accusations were not proven to be unfounded and that they could have given LoSavio more training but they just "didn't think about it at the time."  He was more concerned with losing an employment hearing than protecting female inmates.

## E.  Sheriff Easter is not entitled to summary judgment on state or federal claims

The state claims against Sheriff Easter are equally supported by the facts alleged above by this plaintiff. And to the extent related or rele vant, plaintiff adopts the factual and legal arguments in the previous sections as they may pertain to these claims.  But for purposes here, there is a special statute that is applicable to this case; namely, K.S.A. 19-811 which provides:

> The sheriff shall have the charge and custody of the jail of his county, and all the prisoners in the same, and shall keep such jail himself, or by his deputy or jailer, *for whose acts he and his sureties **shall be liable**.*" (Emphasis added)

Prior references to this statute appear in past case law for reasons other than the clear thrust of the statute itself.  But, in actuality, the statute clearly demands denial of the defendants' claims that they are entitled to summary judgment on Plaintiff's state claims.  The statute renders the sheriff liable on any state claims for acts within the jail.

It requires no speculation to recognize that a jail has unique characteristics that likely give rise to this statute. The sheriff and his jailers have the 24/7 responsibility to feed, clothe and provide a safe environment to the inmates at the same time as they provide protections to others from those same inmates. The inmates have no choice with respect to who cares for them, who feeds them, who protects them, or when or even if those things will happen. Complaining about a jailer, for example, carries with it the very real possibility or probability of retribution. *See* Additional Statement of Uncontroverted  Fact 150 regarding subsequent treatment in retribution. Simply put, the jail is a particular operation and functions differently than all other operations and actions of law enforcement or the government, i.e.  the statute does not govern the sheriff's road patrol or his actions with respect to operations outside of the jail. Accordingly, the jail and

actions therein are treated specifically by this statute which has complete applicability to the jail and only the jail. But it fully governs responsibility in the jail and has been in place since 1868.

The statute is clear in its direction about liability and claims for actions in the jail. Whether those acts are by the sheriff, his deputies or jailers, the sheriff and his sureties "shall be liable." There is no limitation in the statute restricting that liability to a certain quality of action. Frankly, there is little if any reason to distinguish the liability of the sheriff for the actions of his jailers, whether violations of state or federal law. But applicability to state law liability is clear and there is nothing in this statute that would render liability inapplicable to the state law claims.

From the separate perspective of Federal Civil Rights claims, plaintiff contends LoSavio's actions clearly were a violation of the Constitution and actionable under Sec.1983 apart from state law. That this statute renders the sheriff liable for actions that may also violate the Constitution or other laws enacted by the federal government (Sec. 1983) causes no harm to the underlying requirements for federal civil rights violations. It simply provides for a surety to cover the monetary responsibility for such actions. In other words, there can be and is vicarious liability for the jailer's actions, whether a violation of state law or federal law. After all, if there is no wrong action, there is no liability and no surety that applies. The statute could limit liability for certain types of conduct by a jailer – but it doesn't. This specific statute governs the responsibility within the jail. There is no basis to inject some limitation into a statute that is otherwise clear on its face. Besides, there is little difference between an insurance company providing surety for these types of claims and the statute in place for 150 plus years providing surety liability for actions of jailers.

**CONCLUSION**

For all the above and foregoing reasons, the Defendants' Motion should be denied.

RESPECTFULLY SUBMITTED,

/s/ Craig Shultz
Craig Shultz, #09731
Michael Shultz, #23133
Shultz Law Office, P.A.
445 N. Waco
Wichita, Kansas 67202
Telephone: 316-269-2284
Fax: 316-269-2011
Email: craig@shultzlaw.net
*Attorney for Plaintiff*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 10, 2023, a true and correct copy of the above and foregoing RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGE was served by e-filing which will send email notification of the same to the following attorneys of record:

David R. Cooper
Charles E. Branson
Fisher, Patterson, Sayler & Smith, LLP
3550 SW 5th Street
Topeka, KS 66606
Attorneys for Defendants

A physical copy was also mailed to:
LOSAVIO, TONY WILLIAM (KDOC#0127270)
KANSAS DEPARTMENT OF CORRECTIONS
INMATE OUT OF STATE
LANSING CORRECTIONAL FACILITY (LAST KNOWN FACILITY)
P.O. Box 2
Lansing, KS 66043

/s/ Craig Shultz
Craig Shultz, #09731

27